IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

01 AUG 17 PM 3:18

U.S. DISTRICT COURT
N.D. OF ALABAMA

TOMMY THOMPSON,                )
                              )
        Plaintiff,            )
                              )        Civil Action No.
v.                            )        CV-00-AR-2048-M
                              )
DANIEL LIMBAUGH, et al.,      )
                              )
        Defendants.           )

ENTERED

AUG 1 7 2001

## MEMORANDUM OPINION

Before the court is a motion for summary judgment by defendants, Daniel Limbaugh and Limbaugh Home Builders (sometimes hereinafter referred to collectively as "Limbaugh").  Plaintiff, Tommy Thompson ("Thompson"), alleges that Limbaugh violated the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.* ("Copyright Act"), and the Alabama Trade Secrets Act, Ala. Code 1975 § 8-27-1, *et seq.* ("Trade Secrets Act") by constructing a house from architectural plans that Limbaugh received from defendants, James Isbell and his wife, Susan Isbell (collectively, "the Isbells").  For the reasons set forth below, Limbaugh's motion is due to be granted as to Thompson's claim for statutory damages and attorney's fees under the Copyright Act, although denied as to the claim of copyright infringement itself, and granted as to the claim of violation of the Trade Secrets Act.

26

### Pertinent Material Facts

In 1995, in furtherance of a non-formal homebuilding business in which Thompson, James Isbell, and Jimmie Barker Dobbs ("Dobbs") (Susan Isbell's mother) were partners, Thompson completed drawing a set of house plans ("Thompson Plans"). In the Thompson-Isbell-Dobbs concern, Dobbs provided the capital, Thompson and James Isbell the labor. Based on the Thompson Plans, the partnership constructed a house on Kings Forest Drive in Leeds, Alabama. The partnership then sold the house.

James Isbell avers that the Thompson Plans were based, at least in part, on a visit he, Thompson, Susan Isbell, and Dobbs made to a house featured in a "Parade of Homes" publication and on the plans for that house as they appeared in the Parade of Homes magazine. Similarities between the Thompson Plans and the Parade of Homes house include the location of the deck, the kitchen, and the dining room; the presence of a "nook" in the floor plan; and the separation of two of three bedrooms by a bathroom. According to Limbaugh's architectural expert, the Thompson Plans:

> are neither unique, original nor do they evidence any
> remarkable expenditure of intellectual effort or time.
> Neither the dimensions used nor the layout of the plans
> evidence any original thought. The plans are rather
> generic in both concept and detail. Substantially

2

similar exterior and floor plans are common across the country.

Thompson denies ever visiting the Parade of Homes house and asserts that the plans were based on his experiences in residential construction. He has acknowledged that he has seen houses that have plans similar to the Thompson Plans.

Thompson worked on the Thompson Plans at home. Both when he was working on them and when he was not, the plans stayed on a drafting table in the kitchen. His son, Jason Thompson ("Jason"), had a key to the home and was a regular visitor there. After completing the plans, Thompson made five copies at a commercial copying store. He filed one copy with the City of Leeds in order to get a building permit for the house on Kings Forest Drive. Thompson has never tried to retrieve that copy. A second copy was given to a plumber hired to work on the Kings Forest Drive house. It is Thompson's understanding that the plumber's copy was left at the construction site after the plumber was fired, however Thompson himself never retrieved that copy nor did he testify that the copy was actually left at the house site. Thompson gave a third copy to Dobbs. The other two copies were kept by Thompson at home and used at the Kings Forest Drive house site. When copies used at the house site were left there overnight, they were rolled up and

3

stashed away on-site.  Thompson states that, as a general matter,
house plans "disintegrate" when used on-site.  Apparently, one copy
was eventually given to the purchasers of the house; they still
possess it.  The originals are currently held by Jason despite
Thompson's requests that they be returned to him.

Thompson never marked the original or copied plans as
confidential or proprietary in any way.  Nor is there any evidence
that he told anybody to whom he gave the copies that the plans
were, in any sense, confidential.  Nor is there any evidence as to
what the recipients of the copies did with them or how they handled
and stored them.  Thompson has never sold a copy of the plans or
given anyone a license to use them.

Dobbs died in 1997.  All of her personal property passed to
her two daughters, Susan Isbell and Pat Limbaugh, Daniel Limbaugh's
now-deceased wife.  Pat Limbaugh served as the administrator of
Dobbs's estate with Susan Isbell's assistance.  After Dobbs's
passing, Thompson requested the return of the copy of the Thompson
Plans he had given Dobbs and was told that the estate did not
possess such a document.  However, in the middle of 1999, after Pat
Limbaugh died in January, 1999, Susan Isbell found a copy of the
Thompson Plans in Dobbs' personal possessions.  She took this copy
(the "Dobbs Copy") to Linda Wilder ("Wilder"), Thompson's ex-wife

and James Isbell's sister, and requested that Wilder draft house plans (the "Isbell Plans") from the Dobbs Copy.  Jason participated in the drafting of the Isbell Plans.

The Thompson Plans and the Isbell Plans consist of three sub-sets of plans: floor, foundation, and exterior.  Jason drafted the floor plans.  He did so by measuring the specifics of the Thompson Plans with a ruler, then replicating those measurements on a new piece of drafting paper.  He then reversed this intermediate version, thereby creating a mirror image of the plans.  The process by which Wilder drew the foundation and exterior potions of the Isbell Plans is less clear.  However, both Susan Isbell and Wilder declare that Susan Isbell gave Wilder the Dobbs Copy with the instruction to re-draw it with certain changes.  For their efforts, Wilder and Jason received $150 from James and Susan Isbell.  According to the Isbells, Wilder, and Jason, Limbaugh had no involvement in or knowledge of the genesis of the Isbell Plans.

Some differences exist between the Thompson Plans and the Isbell Plans.  There are five differences in the exterior portions of the two house plans: 1) the elevations are reversed; 2) the Isbell Plans have a gable where the Thompson Plans do not; 3) the Isbell Plans call for brick in the center portion and the Thompson Plans call for "Dryvit"; 4) where the Isbell Plans have a vent on

the top of a double gable, the Thompson Plans do not have a vent; and 5) the Isbell Plans have one large window on the uphill side of the front of the house where the Thompson Plans have two small windows.  There are two differences regarding the foundation plans: 1) the elevation reversal; and 2) the Isbell Plans have a cantilevered front with a  detail drawing of the cantilever.  On the floor plans, the elevations are reversed and the Isbell Plans show a bay window in the breakfast nook.  The Thompson Plans do not include the bay window.

After Wilder and Jason completed the Isbell Plans, Susan Isbell showed them to Daniel Limbaugh.  Sometime prior to this, she had asked him if he would build a house on a lot then-owned by both of them if she provided the plans.   He had agreed to that arrangement, apparently with the understanding that Susan Isbell's son would have the right of first refusal to purchase the completed house.  When she presented the Isbell Plans as the plans for the house, Daniel Limbaugh did not inquire into their origins nor did he pay Susan Isbell for them.  He filed the Isbell Plans with the City of Leeds on August 31, 1999 under "Limbaugh Home Builders", which is a proprietorship owned by him and employs him alone. Assumedly, construction began sometime after the issuance of a building permit, in September, 1999.   Susan Isbell sold her

interest in the property to Limbaugh on December 10, 1999.  Because
her son abandoned plans to purchase the house, Limbaugh intends to
sell it on the open market.

After Limbaugh had begun construction, Thompson and Jason went
into the unfinished house and saw a copy of the Isbell Plans on the
floor.   On June 29, 2000, Thompson filed a copyright for the
Thompson Plans with the United States Copyright office.   He used
"Form VA" and described the nature of the work being submitted for
copyright registration as "House Plan".   Under the section entitled
"NATURE OF AUTHORSHIP", Limbaugh checked the box for "Architectural
work".   Among the other choices was "Technical drawing".

Thompson filed his initial complaint on July 24, 2000, naming
Limbaugh and Limbaugh Home Builders as defendants.   He amended his
complaint on November 28, 2000 to add the Isbells as defendants.
Default was entered against the Isbells by the Clerk of this court
on January 29, 2001.  By court order, the setting of a trial on the
issue of the damages to be assessed against the Isbells was
postponed until the resolution of any dispositive motion filed by
Limbaugh.

## Summary Judgment Standard

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be

granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Supreme Court has emphasized that this language means exactly what it says: there must be a genuine issue of material fact, not merely some factual dispute.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986). What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575 (1968)).

On defendant's motion for summary judgment, the court must look at the evidence, construed in plaintiff's favor, to see if a reasonable jury could return a verdict for plaintiff.  If so, defendants' motion for summary judgment must be denied.  If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendant's motion must be granted.

**Discussion**

8

## I.   Copyright Act Claim

Limbaugh presents three arguments for granting summary judgment on Thompson's copyright claim in its entirety.  In the alternative, he contends that the claim, insofar as it seeks the relief of statutory damages and attorney's fees, is due to be dismissed.

### A.  Originality

The first of Limbaugh's three primary arguments is that Thompson's copyright is invalid because his plans are not original. It is a basic precept of copyright law that protection from copyright infringement extends only to original works.  *See* U.S. Const., art. I, § 8, cl. 8; 17 U.S.C. § 102(a).  When the plaintiff produces a certificate of copyright for a work, the burden is on the defendant to show that the work is unoriginal, and thus unworthy of copyright protection. *See Bateman v. Mnmemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996).  To say that a work is "original", in the copyright context, "means only that the work was independently created by the author (as opposed to copied from other work), and that it possesses at least some degree of creativity." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).

Because Thompson has produced a certificate of copyright for the Thompson Plans, the onus is on Limbaugh to show that the plans do not meet the low threshold of the originality requirement. Limbaugh attempts to carry this burden by relying on the opinion of an architectural expert, on the degree of similarity between the Parade of Homes house plans and the Thompson Plans, and on Thompson's acknowledgment that his plans are similar to houses "all over". Thompson contradicts the express or implied significance of Limbaugh's evidence by asserting that he drew upon his own experiences, observations, and ability in drafting his plans. Furthermore, that some similarities exist between, on the one hand, the Parade of Homes house and houses "all over", and, on the other, the Thompson Plans, merely serves to point out that differences exist as well. In the face of the evidence regarding the process by which Thompson created his plans and the evidence regarding the end result of that process, Limbaugh cannot be said to have carried his burden. Therefore, without characterizing the relative strengths of any contradictory evidence, the court finds that the issue of the originality of the Thompson Plans cannot be resolved at the summary judgment stage.


**B.  Substantial similarity**

10

Defendants' second argument as to why Thompson cannot make out a *prima facie* case of copyright infringement is grounded on a purported lack of "substantial similarity" between the Isbell Plans and the Thompson Plans.  If an allegedly infringing work is not substantially similar to the copyrighted work, the plaintiff has not shown by indirect means that his work has been copied.[1]  Even though substantial similarity is usually a question of fact, *see Donald Frederick Evans Assoc., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 904 (11th Cir. 1986), a court may grant summary judgment for the defendant "if no reasonable jury upon proper instruction would find that the two works are substantially similar." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

In arguing that the Isbell Plans are not substantially similar to the Thompson Plans, Limbaugh lists the dissimilarities between the two works, which are noted, *supra*, in the court's recitation of facts, and relies heavily on *Howard v. Sterchi*, 974 F.2d 1272 (11th Cir. 1993), in which the Eleventh Circuit compared two sets of

---

[1]The other requirement for indirect proof of copying is that the defendant had access to the copyrighted work.  That prong of the analysis is not at issue on this summary judgment motion.

The court also notes that Thompson correctly points out that copying may be proven by direct as well as by indirect means.  However, because the court finds below that a genuine issue of material fact remains as to indirect proof of copying, the court need not address the issue of direct proof for purposes of summary judgment.

architectural plans to determine if they were substantially similar. Refusing to upset the lower court's determination that the copyrighted plans and the allegedly infringing plans were not substantially similar, the *Howard* court stated: "In architectural plans of this type, modest dissimilarities are more significant than they may be in other types of art works." Limbaugh characterizes this statement as applicable to this case. However, as the quotation indicates, the statement does not apply to the comparison of any two architectural plans, but only to "architectural plans of this type". The antecedent of that phrase is "country frame style houses and ... houses built with logs which dictate that only square angles be used." In the present case, there are no architectural constraints, such as the necessity of using square angles, or dictated, base-line similarities, such as a country style frame, which would make modest dissimilarities more significant than they would otherwise be. With *Howard* distinguishable on this basis, this court cannot find at this stage that the Isbell Plans and the Thompson Plans are "so dissimilar that no reasonable jury would find them substantially similar." *Infodeck, Inc. v. Meredith-Webb Printing Co.*, 830 F.Supp. 614, 624 (N.D.Ga. 1993). A Rule 50 motion may very well present a bigger problem at trial.

**C.  Use of architectural plans to construct a building as an unpermitted exercise of a copyright**

Limbaugh's third argument presents a more difficult question than do his arguments concerning originality and substantial similarity.  Aside from an unsupported assertion that any copyright liability of the Isbells can be imputed to Limbaugh,[2] Thompson bases Limbaugh's liability on Limbaugh's use of the Isbell Plans to construct the house depicted in those plans.  Defendants contend that, as a matter of law, even assuming the Isbell Plans to be infringing plans,  Limbaugh's mere use of them, in and of itself, does not constitute a copyright violation.  Not surprisingly, Thompson contends that under applicable statutory and case law liability does attach under such circumstances.

Not only is this issue more difficult to resolve than the issues of originality and substantial similarity, its resolution requires a more fundamental analysis of the copyright claim in that its resolution requires reaching an understanding of the scope of the rights the copyright owner lays claim to.  As the Eleventh

---

[2]Thompson maintains that Limbaugh is liable for the Isbells' actions because their house-building agreement was a joint venture, making them agents of each other.  Even accepting his factual characterization of the Limbaugh-Isbell relationship on which that legal proposition is based, Thompson conspicuously fails to cite any copyright case law in support of the proposition itself.  Therefore, the court considers this route to attach liability to Limbaugh under the Copyright Act meritless and unworthy of further discussion.

Circuit has observed: "Before embarking upon any infringement analysis, it is vital to understand that infringing conduct is the unpermitted exercise of a right of the copyright owner." *Bateman*, 79 F.3d at 1542, n.23.  Thus, determining whether Limbaugh's use of the Isbell Plans to construct a house was an unlawful exercise of Thompson's rights requires delineating Thompson's rights as the copyright owner of the Thompson Plans.

This examination necessitates first establishing the nature of the work copyrighted by Thompson, an endeavor somewhat complicated by the particular facts of this case and by the passage of the Architectural Works Copyright Protection Act, Pub.L. No. 101-650, Tit. VII, 104 Stat. 5133 (1990) (codified in scattered sections of 17 U.S.C.) ("AWCPA"), which amended the Copyright Act effective December 1, 1990.  Section 102(a) of the Copyright Act sets out a non-exclusive list of categories of works that may be protected under the Act.   Prior to the AWCPA, architectural plans were protected by copyright law under § 102(a)(5) as "pictorial, graphic and sculptural works" (or "PGS" works). *See The Yankee Candle Co. v. New England Candle Co.*, 14 F.Supp.2d 154, 157 (D.Mass. 1998)(citing 1976 legislative history of the Copyright Act), *vacated pursuant to settlement by* 29 F.Supp.2d 44 (D.Mass. 1998);

14

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §
2.08[D][2][a], at pp. 2-116.1 to 2.118 (2001) (hereinafter,
"*Nimmer*").   AWCPA amended the Copyright Act by adding
"architectural work" to the list of expressly protected categories,
17 U.S.C. § 102(a)(8), and defining it as "the design of a building
as embodied in any tangible medium of expression, including a
building, architectural plans, or drawings."  17 U.S.C. § 101.

The overlap between § 102(a)(5) and § 102(a)(8) was
acknowledged in the House Report on the AWCPA:

> An individual creating an  architectural work by
> depicting that work in plans or drawings will have two
> separate copyrights, one in the architectural work
> (section 102(a)(8)), the other in the plans or drawings
> (section 102(a)(5)).  Either or both of these copyrights
> may be infringed and eligible separately for damages.
> [I]n cases where it is found that both the architectural
> work and the plans have been infringed, courts or juries
> may reduce an award of damages necessary to avoid double
> remuneration....

H.R.Rep. 101-735, *reprinted in* 1990 U.S.C.A.N. 6935, 6950.  Thus,
because "architectural work", as defined in 17 U.S..C. § 101 and as
discussed in the House Report, *see* 1990 U.S.C.A.N. at 6950,
includes an architectural design as embodied in the plans or
drawings, two separate copyrights may be maintained in the same
two-dimensional work.  However, to possess dual copyrights, as a
PGS work and as an architectural work (whether, in the latter

15

category, the design is "embodied in ... a building, architectural plans, or drawings"), the author must submit separate registrations. *See Attia v. Soc'y of the New York Hosp.*, 201 F.3d 50, 53 n.3 (2nd Cir. 1999); 37 C.F.R. § 202.11(c)(4) ("Where dual copyright claims exist in technical drawings and the architectural work depicted in the drawings, any claims with respect to the technical drawings and architectural work must be registered separately."); *see, e.g., Rhein Building Co. v. Gehrt*, 21 F.Supp.2d 896, 907-08, 908 nn.16-17 (citing 37 C.F.R. § 202.11(c)(4) in discussing the dual registration requirement for the particular situation in which the architectural design is embodied in a three-dimensional structure).  The flip side of the dual registration requirement is that if the author fails to submit separate registrations, he is viewed under copyright law as the owner of a either an architectural work or a PGS work, but not both.  In such a case, if the work arguably falls into either category and a question arises as to which category the author has protected his work, courts have looked to the entire record of the case, including the registration form, the complaint, evidentiary submissions, and the arguments presented.  *See, e.g., Attia*, 201 F.3d at 53 n.3 (assuming that the plaintiff's claims relied on §

16

102(a)(5), not § 102(a)(8), because plaintiff did not object to the
defendants' characterization of his work as a PGS work); *Hunt v.
Pasternack*, 192 F.3d 877, 881 (9th Cir. 1999) (looking beyond the
pleadings to the entire record and ruling that plaintiff's
copyright was for an architectural work, not PGS work, despite the
absence of an express allegation of infringement of an
"architectural work" in the complaint); *Rhein*, 21 F.Supp.2d at 908
n.16 (relying on the registration form submitted by the plaintiff
and a subsequent attempt to "correct" the form to make this
determination).

Among any other consequences that may flow from this category
determination, it can be said that the determination unavoidably
shapes, as a matter of law, the bundle of exclusive rights the
author possesses under the Copyright Act.   17 U.S.C. § 106
enumerates the exclusive rights a copyright owner possesses
"[s]ubject to sections 107 through 120."   Section 113 ("Scope of
exclusive rights in pictorial, graphic, and sculptural works") and
§ 120 ("Scope of exclusive rights in architectural works"), as
their titles indicate, restrict § 106 rights by reference to the
categorization of the work as, respectively, a PGS work or an
architectural work.   Whether the differing restrictions which are

traceable to the categorization of the work have any relevance will depend on the facts of each case.  *Cf. Attia*, 201 F.3d at 53 n.3 (noting that the outcome of the appeal in that case was not altered by whether the plaintiff had registered his work as architectural or PGS).

In this case, Thompson did not submit separate copyrights. That much is obvious.  He, therefore, protected his creation as an architectural work as embodied in the plans or as a PGS work. Which one is not immediately obvious.  The complaint sweepingly invokes the whole of the Copyright Act and does not mention either category, by name or U.S.C. section number.  Thompson's deposition is similarly un-illuminating.  Likewise, his brief submitted in opposition to Limbaugh's summary judgment motion contains no mention of the AWCPA or § 102(a)(8) - or, for that matter, "PGS" or § 102(a)(5).  However, his argument on summary judgment, like Limbaugh's, relies, in pertinent part, only on pre-AWCPA case law. In this respect, this case is like *Attia*, in which the plaintiff did not object to the defendants' characterization of his work as PGS work and the rest of the record, including the complaint, was equivocal.  Accordingly, the court assumed that plaintiff's claims rely on § 102(a)(5), not § 102(a)(8).  *See Attia*, 201 F.3d at 53

18

n.3.

However, *Attia* is distinguishable in two ways.  First, and more significantly, the record here is not entirely devoid of an invocation of one of the categories.  Thompson's registration form, Form VA, is the form used for PGS works and for architectural works.  *See* 37 C.F.R. § 202.3(b)(1)(iii), (c)(2) (PGS); 37 C.F.R. § 202.11(c)(3) (architectural).  On it, he characterized what he authored as "Architectural work" by checking that box under the "NATURE OF AUTHORSHIP" portion of the form.  Despite the failure to expressly follow-up on this characterization in submissions to the court, this court views the indication on the registration form as weighing heavily in favor of finding that Thompson's claim relies on § 102(a)(8), as opposed to § 102(a)(5).  Moreover, as discussed below, inferring the category of his work to be architectural cuts in Thompson's favor.  Thus, the inference accords with the general rule that at summary judgment all inferences should be made in non-movant's favor.

The reason the inference that Thompson protected his plans as an architectural work favors him is also the second way in which *Attia* is distinguishable from the present case.  In *Attia*, the court noted that the outcome of plaintiff's case did not hinge on

whether his work was characterized as architectural or PGS.  *See*

*Attia*, 201 F.3d at 53 n.3.  The same cannot be said here.  As noted

above, the exclusive rights of a copyright owner in a PGS work are

limited by 17 U.S.C. § 113.  Section 113(b) provides:

> This title does not afford, to the owner of copyright in
> a work that portrays a useful article as such, any
> greater or lesser rights with respect to the making,
> distribution, or display of the useful article so
> portrayed than those afforded to such works under the
> law, whether title 17 or the common law or statutes of a
> State, in effect on December 31, 1977, as held applicable
> and construed by a court in an action brought under this
> title.

Thus, a copyright in architectural plans which portray a building,

*i.e.*, a "useful article", grants the holder of the copyright only

those rights regarding construction of the portrayed building that

existed under the applicable law effective prior to January 1,

1978, the effective date of the Copyright Act.  *See Robert R. Jones*

*Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 278 (6th Cir. 1988);

*Demetriades v. Kaufmann*, 680 F.Supp. 658, 663 (S.D.N.Y. 1988); 1

*Nimmer* § 2.08[D][2][a].  Under the federal law applicable in this

circuit on December 31, 1977,[3] a copyright action could not be

_____

[3] *Nimmer* points out that the proper interpretation of the applicable law
portion of § 113(b) is arguable.  *See* 1 *Nimmer* § 2.08[D][2][a], at pp.2-121 to
2-123.  It suggests the rule that, regardless of whether a work is created
before or after January 1, 1978, the applicable law be chosen "as if the
[Copyright] Act of 1976 had never been enacted."  1 *Nimmer*, at p.2-122.  In
the present case, that rule would result in application of the state statutory

maintained against an individual whose sole basis of liability was the building of a structure based on copyrighted plans. *See Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 899 (5th Cir. 1972); *DeSilva Const. Corp. v. Herrald*, 213 F.Supp. 184, 195 (M.D.Fla. 1962); 1 *Nimmer* § 2.08[D][2][a], at pp.2-123 to 2-124 (citing *Imperial Homes*); 1 *Nimmer* § 4.12[C], at p.4-68.1 (indicating that *Imperial Homes*, *DeSilva*, and *Donald Frederick Evans*, 785 F.2d at 901 n.7 support the proposition that "one who constructs a building

_____

or common law, as opposed to the federal law, effective on December 31, 1977 because Thompson's plans, as unregistered and unpublished plans as of the date of the alleged infringement, would not have qualified for protection under the version of the federal copyright law, the 1909 Copyright Act, that was in effect on December 31, 1977. *See* 1 *Nimmer*, at pp.2-122 to 2-123. Consequently, the plans would then be eligible for protection under appropriate state law. *See* 1 *Nimmer*, at pp.2-122 to 2-123.

The alternative rule, and the one used by this court, determines the applicable law based on whether the work was created before or after January 1, 1978. *See* 1 *Nimmer*, at p.2-122.   Under the present facts, this rule calls for applying federal copyright law effective on December 31, 1977 (namely, the 1909 Copyright Act and accompanying case law) because all works authored on or after January 1, 1978, but left unpublished, such as Thompson's plans, are subject to title 17 at the instant of their creation. *See* 1 *Nimmer*, at p.2-122.

Unlike the first possible rule, the second appears to run with, not against, the thrust of the Copyright Act's preemption of state law. *Cf.* 1 *Nimmer* § 1.01[B], at p.1-9. Specifically, adoption of the first rule would undercut the clear direction contained in 17 U.S.C. § 301 that most works unpublished as of or after January 1, 1978 would be governed exclusively by federal, not state, law. *Cf.* 3 *Nimmer* § 9.09[A], at pp. 9-131 to 9-132. That is, the first rule would serve to reintroduce state law through a backdoor when the front door has been veritably shut. Moreover, as far as this court's research reveals, the law of the state which would be applied in this case is quite obscure on the liability question at issue here. Given the arguability of the appropriate rule and the clarity with which the Copyright Act sought to bring works such as Thompson's plans under federal law, the court respectfully foregoes adopting the rule suggested in *Nimmer*, and therefore applies federal law effective on December 31, 1977.

based upon another's plans cannot be an infringing 'copier'").
Therefore, if Thompson protected his plans as PGS works, Limbaugh
would be entitled to summary judgment because his use of the Isbell
Plans, even if those plans were infringing copies of the Thompson
Plans, would be a permitted exercise of a copyright.

This does not hold, as a matter of law, for architectural
works. First, it is clear from the Copyright Act itself that § 113
does not apply to works that fall under § 102(a)(8) and that § 120
does not contain a restriction on the copyright owner's bundle of
exclusive rights like that found in § 113(b). Second, while it
may be true that the primary objective of the AWCPA was to extend
copyright protection to physical architecture, *see Guillot-Vogt
Assoc., Inc. v. Holly & Smith*, 848 F.Supp. 682, 686-87 (E.D.La.
1994); 1 *Nimmer* § 2.20, at pp.2-213 to 2-215, the definition of
"architectural work", as well as the relevant legislative history,
extends those same protections to architectural plans, whether they
have been embodied in a lawfully built building or not. *See Hunt*,
192 F.3d 877 (citing H.R.Rep. No. 101-735); 1 *Nimmer* § 2.20, at pp.
2-213 to 2-215. Thus, by making it unlawful to construct a three-
dimensional copy of a design embodied in a building, regardless of
whether infringing plans were used, *see Guillot-Vogt Assoc.*, 848

F.Supp. at 686, the AWCPA made it unlawful to construct a three-dimensional "copy" of a design embodied in architectural plans, even without use of infringing plans to carry out the construction. *See Hunt*, 192 F.3d 877; 1 *Nimmer* § 2.20.   Therefore, the consequence of the court's inference, made solely for the purposes of deciding this summary judgment motion, that Thompson registered his plans as an architectural work, is that summary judgment cannot be granted Limbaugh.   His mere use of the Isbell Plans, assumed *arguendo* to be infringing, to construct the house depicted in them may, as a matter of law, constitute a violation of the Copyright Act.

**D.   Claim for statutory damages and attorney's fees under the Copyright Act**

Reading Thompson's complaint as making a claim for statutory damages and attorney's fees based on Limbaugh's alleged infringement of the Copyright Act, Limbaugh contends, as alternative to his three main arguments, that Thompson is not entitled to such relief.   Section 412 provides:

> [N]o award of statutory damages or of attorney's fees ... shall be made for –
>
> (1)   any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
>
> (2)   any infringement of copyright commenced after

23

> first publication of the work and before the
> effective date of its registration, unless
> such registration is made within three months
> after the first publication of the work.

Because the Thompson Plans have not been published, § 412(2) is inapplicable here.   Section 412(1), however, does preclude the relief of statutory damages or attorney's fees, because the latest possible commencement of Limbaugh's allegedly unlawful conduct occurred in September of 1999.   Thompson did not register his work until June of 2000.   Limbaugh's argument is well-taken, and Thompson's action, insofar as it requests such relief, is due to be dismissed.


## II.   Trade Secrets Act Claim

It is manifest under Alabama statutory law that to maintain an action based on misappropriation of a trade secret that the misappropriated material qualify as a "trade secret".   Ala. Code § 8-27-3.   Among the elements of a trade secret are that the protected material  "cannot be readily ascertained or derived from publicly available information [and] [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."   Ala. Code § 8-27-2(1)d, e.

In this case, Thompson's handling of the plans undercuts the

24

claim that either of these two requirements are met.  Thompson never communicated, by writing on the copies of the plans or telling any individual who received a copy from him, that the plans were in any way secret or confidential.  The current whereabouts of several of the copies do not convey that Thompson ever held the plans out as a trade secret.  One copy was filed with the City of Leeds.  Thompson has not attempted to retrieve it.  One copy, given to the plumbing sub-contractor, may or may not have been returned.  The original itself remains in the possession of Jason.  For these versions of the plans, there is scant evidence on the degree, if any, they were safely stored in an effort to maintain their alleged secrecy.  On these facts, Thompson's claim for a trade secret violation fails.  *See Public Systems, Inc. v. Towry*, 587 So.2d 969 (Ala. 1991); *Allied Supply Co. v. Brown*, 585 So.2d 33 (Ala. 1991).

## Conclusion

A separate and appropriate order will be entered.

DONE this  17ᵗʰ  day of August, 2001.

_William M. Acker_

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

25